1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4       HONORABLE MARIANA R. PFAELZER, DISTRICT JUDGE PRESIDING

5                        ---

6

7    WEBZERO, LLC.,                    )
                                       )
8           PLAINTIFF,                 )
                                       )
9           VS.                        )   CASE NO. CV 08-504-MRP
                                       )   10:06 TO 10:55 A.M.
10   CLICVU, INC.,                     )
                                       )
11          DEFENDANT.                 )
     _____ )
12

13

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                       MOTIONS CALENDAR

17                  LOS ANGELES, CALIFORNIA
                    MONDAY, APRIL 27, 2009
18

19

20

21
                     MARGARET J. BABYKIN
22                     COURT REPORTER
                 442 - U. S. DISTRICT COURTHOUSE
23                 312 NORTH SPRING STREET
                 LOS ANGELES, CALIFORNIA  90012
24                    (626) 963-0566

25

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3           BUCHALTER NEMER
             BY:  RICHARD P. ORMOND
 4               -AND-
                 SHANNON KEAST
 5               ATTORNEYS AT LAW
             1000 WILSHIRE BOULEVARD
 6           SUITE 1500
             LOS ANGELES, CALIFORNIA  90017
 7
     ON BEHALF OF THE DEFENDANT:
 8
             DARBY & DARBY
 9           BY:  PIERRE R. YANNEY
                 ATTORNEY AT LAW
10           7 WORLD TRADE CENTER
             250 GREENWICH STREET
11           NEW YORK, NEW YORK  10007

12           CLICVU, INC.
             BY:  JUSTIN GREENE
13               ATTORNEY AT LAW
             2 PENN PLAZA
14           SUITE 1990
             NEW YORK, NEW YORK  10121
15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    CV 08-504-MRP                           APRIL 27, 2009

3    HEARING:   DEFENDANT CLICVU'S MOTION FOR SUMMARY JUDGMENT OF
                NON-INFRINGEMENT
4               PLAINTIFF'S MOTION AND CROSS-MOTION FOR SUMMARY
                JUDGMENT
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; MONDAY APRIL 27, 2009; 10:06 A.M.

 2               THE CLERK:  ALL RISE.

 3               THIS HONORABLE UNITED STATES DISTRICT COURT IN AND

 4     FOR THE CENTRAL DISTRICT OF CALIFORNIA IS NOW IN SESSION.

 5               THE HONORABLE MARIANA R. PFAELZER, JUDGE, PRESIDING.

 6               THANK YOU.  PLEASE BE SEATED.

 7               IN THE MATTER OF CALENDAR ITEM NUMBER ONE, CASE

 8     NUMBER CV 08-504, WEBZERO, LLC. VERSUS CLICVU, INC.

 9               COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

10     RECORD.

11               MR. ORMOND:  GOOD MORNING, YOUR HONOR.

12               RICHARD ORMOND AND SHANNON KEAST OF BUCHALTER NEMER

13     ON BEHALF OF WEBZERO.

14               MR. YANNEY:  GOOD MORNING.

15               PIERRE YANNEY OF DARBY & DARBY ON BEHALF OF THE

16     DEFENDANT.

17               AND WITH ME AT COUNSEL TABLE IS MR. JUSTIN GREENE

18     REPRESENTING CLICVU.

19               THE COURT:  ALL RIGHT.  SHALL WE GET ON WITH THE

20     MOTION.

21               MR. ORMOND:  WE'D BE HAPPY TO, YOUR HONOR.

22               THE COURT:  YES.  FINE.

23               MS. KEAST:  IT'S YOUR MOTION.  YOU CAN GO AHEAD

24     FIRST.

25               MR. YANNEY:  OKAY.
```

1        MAY I APPROACH, YOUR HONOR?

2        THE COURT:  YES.  CERTAINLY --

3        MR. YANNEY:  I HAVE COPIES --

4        THE COURT:  -- DO THAT.

5        (DEFENSE COUNSEL CONFERRING.)

6        THE COURT:  MR. YANNEY --

7        MR. YANNEY:  YES.

8        THE COURT:  -- IS YOUR FATHER A LAWYER?

9        MR. YANNEY:  EXCUSE ME?

10       THE COURT:  IS YOUR FATHER A LAWYER?

11       MR. YANNEY:  NO.  HE IS AN ENGINEER.

12       THE COURT:  HMM.

13       MR. YANNEY:  I BROKE THE MOLD PARTIALLY.  ALTHOUGH I

14  STARTED OUT AS AN ENGINEER.

15       OKAY.  I WILL TRY AND BE AS BRIEF AND AS EFFICIENT AS

16  POSSIBLE.

17       THE COURT:  YOU DO WHAT YOU WANT.

18       MR. YANNEY:  BRIEF AND EFFICIENT IN THE SENSE THAT A

19  LOT OF THE ARGUMENTS THAT I AM GOING TO DISCUSS APPLY ACROSS

20  SEVERAL OF THE CLAIMS.  SO, I'M JUST GOING TO TALK ABOUT THEM

21  IN CONNECTION WITH THE FIRST CLAIMS THAT THEY APPEAR INSTEAD OF

22  HAVING TO REPEAT IT AD NAUSEAM THROUGH ALL THE OTHER CLAIMS.

23       WEBZERO FILED THIS ACTION CHARGING MY CLIENT CLICVU

24  WITH PATENT INFRINGEMENT.  THERE ARE SOME OTHER CLAIMS THAT GOT

25  DROPPED ALONG THE WAY.  THESE ARE THE ASSERTED CLAIMS.  AND

1    SUBSEQUENT TO THE COURT'S CLAIM CONSTRUCTION WE MOVED FOR

2    SUMMARY JUDGMENT OF NON-INFRINGEMENT.  AND THAT'S WHAT BRINGS

3    US HERE TODAY.

4          SO, HERE IS OUR STARTING POINT.  THERE WERE FOUR

5    CLAIM TERMS THAT WE HAD IDENTIFIED AS REQUIRING THE COURT'S

6    CONSTRUCTION:  "WEB PAGE," "DEDICATED FOR USE," "UNIQUE EMAIL

7    FORWARDING ADDRESS" AND THE "AUTOMATICALLY ASSOCIATED WITH."

8          AND WHAT I HAVE HERE ARE THE CLAIM CONSTRUCTIONS THAT

9    THE COURT RENDERED.  SO, THIS IS OUR STARTING POINT IN TERMS OF

10   WHAT DO THE CLAIM TERMS REALLY MEAN.

11         I THINK I CAN GO THROUGH THIS PART FAIRLY QUICKLY,

12   WHICH IS THE LEGAL PRINCIPLES ON SUMMARY JUDGMENT.

13         THE COURT:  OH, NO.  I KNOW WHAT THEY ARE.

14         MR. YANNEY:  OKAY.

15         THE COURT:  I SHOULD TELL YOU, MR. YANNEY, WE HAVE

16   LOTS OF PATENT CASES IN HERE.

17         MR. YANNEY:  OKAY.

18         CAN I ASK, YOUR HONOR.  DO WE HAVE TIME CONSTRAINTS

19   IN TERMS OF HOW LONG THIS HEARING WILL TAKE OR --

20         THE COURT:  THE REASON --

21         MR. YANNEY:  -- HOW MUCH YOU HAVE ALLOTTED.

22         THE COURT:  THE REASON I TAKE THESE CASES IS THAT

23   THEY ARE SOMEWHAT FOR SOME REASON WHEN WE LOOK AT THEM MORE

24   COMPLEX.  AND AFTER WE TAKE THEM ALONG WITH, LET'S SAY, 20

25   OTHER PATENT CASES, WE WORK ON THEM UNTIL THEY ARE DISPOSED OF

1    -- THEY'RE TRIED OR HOWEVER ELSE THEY'RE DISPOSED OF.

2              AND, SO, WE ARE VERY USED TO CLAIM CONSTRUCTION.  AND

3    I KNOW THE PRINCIPLES OF IT.  AND NOW, YOU KNOW, ALL COURTS

4    MAKE MISTAKES.  SO, I CAN'T -- I CAN'T CLAIM TO BE CORRECT

5    EVERY TIME.  BUT I -- IF YOU ARE HERE, YOU HAVE AS LONG AS YOU

6    WANT TO ARGUE.  AND I DO KNOW QUITE WHAT I ALREADY DID.  AND

7    WITH THAT, WELL, THAT'S REALLY ALL I HAVE TO SAY.

8              MR. YANNEY:  OKAY.

9              WE'RE HERE BASICALLY TO PROVE THAT THERE IS NO

10   INFRINGEMENT BY CLICVU SPAMEX PRODUCT.  AND TO DO THAT, IT'S A

11   VERY SIMPLE PROCESS.  WE TAKE THE CLAIMS.  THEY'VE BEEN

12   CONSTRUED.  AND WE COMPARE THOSE CLAIMS TO THE ACCUSED

13   PRODUCT.  AND FOR INFRINGEMENT TO BE FOUND, THE ACCUSED PRODUCT

14   HAS TO SATISFY EVERY SINGLE ELEMENT OF EVERY SINGLE CLAIM

15   THAT'S ASSERTED.  AND IF ONE ELEMENT IS NOT FOUND, THEN, THERE

16   IS NO INFRINGEMENT --

17             THE COURT:  UNDER THE ALL --

18             MR. YANNEY:  -- UNDER THAT CLAIM.

19             THE COURT:  -- ELEMENTS RULE.  YES.

20             MR. YANNEY:  YES.

21             NOW, WE HAVE THREE MAJOR NON-INFRINGEMENT ARGUMENTS

22   THAT APPLY TO MOST OF THE CLAIMS.  AND THEY ARE THAT IN THE

23   SPAMEX PRODUCT WE DO NOT ASSOCIATE A DISPOSABLE EMAIL ADDRESS

24   WITH A WEB PAGE.  BUT INSTEAD, TO THE EXTENT WE HAVE ANY

25   ASSOCIATION, IT'S WITH A WEBSITE.  AND THOSE HAVE BEEN

1    CONSTRUED TO BE DIFFERENT THINGS.  THEY'RE DESCRIBED IN THE

2    PATENT AS DIFFERENT THINGS.  SO, THEREFORE, SINCE THE CLAIMS

3    REQUIRE ASSOCIATION WITH A WEB PAGE, WE DO NOT ASSOCIATE WITH A

4    WEB PAGE.  AND, THEREFORE, THERE SHOULD BE NO INFRINGEMENT

5    BASED ON THAT POINT.

6            SECOND POINT:  THE CLAIMS REQUIRE THAT THE

7    ASSOCIATION BETWEEN THE DISPOSABLE EMAIL ADDRESS AND THE WEB

8    PAGE BE PERFORMED AUTOMATICALLY.  AND WHEN YOU READ THE PATENT

9    CLAIMS IN THE CONTEXT OF THE PATENT SPECIFICATION THAT

10   DESCRIBES THE INVENTION, "AUTOMATIC ASSOCIATION" REALLY MEANS

11   WITHOUT ANY USER INPUT.

12           THE THIRD ARGUMENT THAT WE HAVE, WHICH APPLIES TO NOT

13   ALL OF THE CLAIMS BUT MOST OF THEM -- AND THE EXCEPTION BEING,

14   I BELIEVE, CLAIM 11 AND THE DEPENDENT CLAIMS OFF OF THAT -- IS

15   THE "DEDICATED FOR USE" LIMITATION.  THOSE CLAIMS REQUIRE THAT

16   THE DISPOSABLE EMAIL ADDRESS THAT'S CREATED BE DEDICATED FOR

17   USE AT ALL TIMES WITH ONE SINGLE ENTITY.

18           AND AS I'LL SHOW, REFERRING TO THE EXHIBITS LATER ON,

19   IN THE SPAMEX PRODUCT, WE DON'T HAVE THIS CONCEPT OF "DEDICATED

20   FOR USE" IN THE SENSE THAT THE SAME DISPOSABLE EMAIL ADDRESS

21   CAN BE USED WITH MANY DIFFERENT ENTITIES.  AND AS A RESULT,

22   THERE'S CLEARLY NO DEDICATION FOR USE OF ANY EMAIL ADDRESS FOR

23   A SINGLE ENTITY.

24           SO, TO SEE WHERE THESE CLAIM TERMS FIT INTO THE

25   CONTEXT OF THE CLAIMS, I HAVE CLAIM 1 HERE WITH THE POINTS THAT

1   I JUST DISCUSSED HIGHLIGHTED.

2            SO, WE HAVE A METHOD FOR CREATING AND FORWARDING AN

3   EMAIL FORWARDING ADDRESS.  AND IT COMPRISES SEVERAL STEPS.  THE

4   FIRST ONE IS THE ACTUAL CREATION AND STORING OF THAT EMAIL

5   FORWARDING ADDRESS.  AND THAT IS DONE IN A WAY THAT WHERE THE

6   EMAIL ADDRESS, AGAIN, IS AUTOMATICALLY "ASSOCIATED WITH SAID

7   WEB PAGE."

8            WITHIN THAT PHRASE THERE ARE REALLY TWO REQUIREMENTS

9   -- THE AUTOMATIC ASSOCIATION AND THAT THE ASSOCIATION BE WITH

10  A WEB PAGE.  NEITHER ONE OF THOSE IS FOUND IN THE CLICVU SPAMEX

11  PRODUCT.

12           AS CLAIM 1 GOES ON TO SAY THAT THAT EMAIL ADDRESS IS

13  AGAIN "DEDICATED FOR USE" BY AN ENTITY.  THE "DEDICATED FOR

14  USE" BY AN ENTITY MEANS THAT IT IS FOR THE SOLE AND EXCLUSIVE

15  USE FOR THAT SINGLE ENTITY.  AND AS I'LL SHOW LATER ON, WE JUST

16  DON'T HAVE THAT WITHIN SPAMEX.

17           NOW, "WEB PAGE" MEANS A SINGLE WEB PAGE WHICH MIGHT

18  BE PART OF A LARGER COLLECTION OR A LARGER BODY COMMONLY KNOWN

19  AS A WEBSITE.  AND AS I SAID BEFORE, WE DO NOT ASSOCIATE WITH A

20  WEB PAGE.  WE ASSOCIATE WITH A WEBSITE.  THEY ARE TWO DIFFERENT

21  ANIMALS.  THEY'RE TREATED AS TWO DIFFERENT ANIMALS IN THE

22  PATENT.

23           AND, ACTUALLY, IF YOU TAKE A LOOK AT THE PATENT

24  ITSELF -- I'M HOPING WE DID THE COUNT CORRECTLY.  BUT IN THE

25  PATENT SPECIFICATION IT USES THE TERM "WEB PAGE" 93 TIMES.  AND

1    THE SPECIFICATION ALSO USES THE TERM "WEBSITE" 21 TIMES.  AND

2    SOMETIMES THEY'RE BOTH USED ACTUALLY IN THE SAME SENTENCE.  SO,

3    THERE IS A CLEAR UNDERSTANDING THAT THESE ARE TWO DIFFERENT

4    ANIMALS.  THEY MEAN DIFFERENT THINGS.

5         IF YOU LOOK AT THE CLAIMS, HOWEVER, THE CLAIMS USE

6    THE TERM "WEB PAGE" 51 TIMES AND THE TERM "WEBSITE" ZERO.  SO,

7    THERE IS A CONSCIOUS DECISION -- IT'S NOT BY ACCIDENT -- TO USE

8    ONLY THE TERM "WEB PAGE" IN THE CLAIMS.  AND IF THE INVENTOR

9    HAD WANTED TO COVER ANY KIND OF ASSOCIATION WITH WEBSITE, WELL,

10   THEY CLEARLY KNEW WHAT A WEBSITE WAS.  THEY KNEW WHAT A WEB

11   PAGE WAS.  THEY USED THE DIFFERENT TERMS.  BUT WHEN IT GOT DOWN

12   TO WRITING THE CLAIMS, THERE WAS A CONSCIOUS DECISION MADE TO

13   USE ONLY THE TERM WEB PAGE.

14        NOW, WE CAN'T SIT HERE TODAY AND KIND OF REWIND AND

15   REWRITE WHAT THE CLAIMS SAY OR WHAT THE INVENTOR WANTS THEM TO

16   COVER TODAY.  ALL WE HAVE IS THE WORDS OF THE INVENTOR -- WHAT

17   THEY CHOSE TO COVER AND WHAT THE PATENT OFFICE GRANTED.

18        NOW, LET'S TAKE A LOOK AT SOME EXAMPLES FROM SPAMEX.

19        IF YOU LOOK HERE YOU'LL SEE THE -- ALL THESE EXHIBITS

20   COME FROM THE DECLARATION OF JUSTIN GREENE, WHICH WAS SUBMITTED

21   IN CONJUNCTION WITH OUR PAPERS.  THE ONLY THING I'VE DONE IS TO

22   ADD SOME ARROWS AND SOME DESCRIPTORS IN BLACK JUST TO KIND OF

23   POINT OUT THE RELEVANT PORTIONS OF THESE EXHIBITS.

24        SO, IF WE LOOK AT THIS EXHIBIT 5, WITHIN SPAMEX,

25   YOU'LL SEE A FIELD WHICH IS "SITE DOMAIN."  AND THIS SPECIFIC

1    ONE HAPPENS TO BE GOOGLE.COM.  THERE IS NO REFERENCE TO A "WEB

2    PAGE."  IF IT WAS REFERRING TO A WEB PAGE OR ASSOCIATING TO A

3    WEB PAGE, IT WOULD HAVE SIGNIFICANTLY DIFFERENT INFORMATION.

4            AND IF YOU LOOK AT THE TOP OF EXHIBIT 5, THERE WE SEE

5    AN EXAMPLE OF A WEB PAGE.  IT'S NOT JUST GOOGLE.COM.  IT'S A

6    WHOLE LOT MORE THAN THAT.  THERE IS SOME INTERNET PROTOCOL

7    INFORMATION.  YOU KNOW THE "HTTP."  THERE'S THE MAPS.  THAT'S

8    HOW YOU WOULD REFER TO A WEB PAGE.  THAT'S HOW YOU WOULD

9    ASSOCIATE TO A WEB PAGE.  BUT WITHIN THE SPAMEX PRODUCT, WHICH

10   IS SHOWN IN THIS POP-UP SCREEN, WE DON'T HAVE ANYTHING THAT'S

11   ASSOCIATED WITH A WEB PAGE.

12           THIS NEXT EXHIBIT JUST SHOWS THAT SAME POINT AGAIN.

13           NOW, LET'S TALK ABOUT "AUTOMATIC ASSOCIATION."

14           THE "AUTOMATIC ASSOCIATION" HAS BEEN INTERPRETED TO

15   MEAN,

16           "WITHOUT ANY ADDITIONAL USER INPUT OR INTERACTION,

17           ASSOCIATED WITH."

18           BUT YOUR HONOR'S CLAIM CONSTRUCTION ORDER SAYS THAT

19   THE "AUTOMATIC ASSOCIATION" REFERS TO THE FACT THAT THERE IS NO

20   USER INPUT OR NO USER INTERACTION IN CONNECTION WITH THE

21   ASSOCIATION PROCESS BUT THAT THERE COULD BE SOME USER INPUT OR

22   USER INTERACTION IN CONNECTION WITH OTHER PORTIONS OF THE

23   PROCESS.

24           AND TO SEE THIS ALL IN CONTEXT IN A WAY THAT MAKES

25   SENSE IN CONNECTION WITH THE PATENT, THE INVENTION, HOW IT WAS

1   DESCRIBED, IT'S FAIRLY INSTRUCTIVE TO ACTUALLY LOOK AT THE

2   DESCRIPTION OF THE INVENTION.

3           AND LET ME SEE IF I CAN PUT THAT UP ON THE

4   PROJECTOR.

5           (PAUSE IN PROCEEDINGS.)

6           MR. YANNEY:  OKAY.  I AM -- EXCUSE ME A MINUTE.

7           OKAY.  IF YOU LOOK AT THE PATENT AT COLUMN 15 ABOUT

8   LINES 23 TO 25, HERE IT'S DESCRIBING THE INVENTION.  IT SAYS

9   THAT:

10          "ONCE REGISTERED USERS CAN CREATE EMAIL FORWARDING

11          ADDRESSES QUICKLY AND EASILY WHENEVER AN EMAIL

12          ADDRESS IS REQUESTED SIMPLY BY CLICKING A WEB CONTROL

13          CREATED IN THE BROWSER."

14          SO, WHAT IT'S DESCRIBING IS THE INVENTION IS

15   SOMETHING WHERE A USER JUST CLICKS.  AND EVERYTHING ELSE

16   HAPPENS AUTOMATICALLY.  THE EMAIL ADDRESS IS CREATED.  IT'S

17   ASSOCIATED WITH THE WEB PAGE AND THEN PRESENTED TO THE USER.

18   THAT IS THE UNDERSTANDING OF WHAT "AUTOMATIC ASSOCIATION" MEANS

19   IN THE CONTEXT OF THIS PATENT.

20          AND AS I SAID BEFORE, WE DON'T HAVE ANY AUTOMATIC

21   ASSOCIATION IN THE SPAMEX PRODUCT BECAUSE IN SPAMEX IT'S A

22   MULTI-STEP PROCESS.  YOU KNOW, THE USER FIRST REQUESTS AN EMAIL

23   ADDRESS.  THE USER IS THEN PRESENTED WITH ADDITIONAL SCREENS.

24   EACH TIME THE USER HAS TO EITHER CONFIRM OR CONTINUE.  THERE'S

25   AT LEAST TWO DIFFERENT SCREENS.  AND IT'S ONLY AFTER THAT

1    HAPPENS THAT THE EMAIL ADDRESS IS THEN CREATED AND ASSOCIATED.

2         NOW, ONE POINT I'D JUST LIKE TO MAKE IS ANY KIND OF

3    COMPUTER-RELATED PROCESS REGARDLESS OF HOW MANUAL INTENSIVE IT

4    IS, IT'S ALWAYS GOING TO HAVE SOME KIND OF AUTOMATIC STEP

5    THAT'S TAKING PLACE BY THE COMPUTER BY ITSELF UNLESS YOU WERE

6    ACTUALLY TO PHYSICALLY GET IN AND, YOU KNOW, DISCONNECT ALL THE

7    WIRES AND, YOU KNOW, PHYSICALLY GET IN AND MOVE INFORMATION

8    FROM ONE MEMORY TO ANOTHER MEMORY.  SOMETHING IS GOING TO

9    HAPPEN AT SOME POINT WITHIN THE COMPUTER THAT'S PURELY

10   AUTOMATIC BECAUSE THAT'S THE WHOLE POINT OF HAVING A COMPUTER

11   IS TO EXECUTE THESE STEPS.  SO, WE HAVE TO UNDERSTAND THIS

12   AUTOMATIC ASSOCIATION IN THE CONTEXT OF WELL EVERYTHING IN A

13   COMPUTER HAPPENS AUTOMATICALLY.  THIS IS AN EXTRA LEVEL OF

14   AUTOMATIC IN THE SENSE OF NOT REQUIRING ANY KIND OF USER

15   INTERACTION OR BACK AND FORTH.

16        AND AGAIN TO UNDERSTAND THIS IN CONTEXT, THERE IS

17   SOME DESCRIPTION OF THE PRIOR ART SYSTEMS THAT THIS PATENT WAS

18   TRYING TO DISTINGUISH OVER.  AND IF WE LOOK AT -- THIS IS AT

19   THE BOTTOM OF COLUMN 3.  HERE WE HAVE THE INVENTOR TELLING US

20   WHAT THE SHORTCOMINGS ARE OF THESE PRIOR ART SYSTEMS.

21        IT SAYS,

22        "ONE IMPLEMENTATION AUTOMATICALLY REMEMBERS THE

23        USER PASSWORD YET STILL REQUIRES THE USER TO

24        CONFIRM THE USER NAME AND THEN CONFIRM THE PASSWORD."

25        SO, AGAIN, IT'S REQUIRING MULTIPLE STEPS THAT THE

1    USER HAS TO TAKE IN ORDER TO GET AN EMAIL ADDRESS GENERATED FOR

2    THEM.

3             GOING ON TO COLUMN 3 -- SORRY, COLUMN 4, ABOUT LINE

4    6, AGAIN, TALKING ABOUT THE DISADVANTAGES OF THIS PRIOR ART --

5    THESE SO-CALLED GEN-2 EMAIL SERVICES -- AGAIN, THE INVENTOR

6    TELLS US HERE'S THE PROBLEM WITH THE PRIOR ART.

7             "THE USER IS THEREFORE REQUIRED TO PERFORM MULTIPLE

8             STEPS THROUGH MULTIPLE BROWSER WINDOWS.  THIS NOT

9             ONLY MAKES THE PROCESS OF CREATING FORWARDING EMAIL

10            ADDRESSES TIME-CONSUMING AND ONEROUS, BUT ALSO

11            DISTRACTS THE USER'S FOCUS."

12            SO, HERE WE HAVE KIND OF THE GROUNDWORK FOR WHAT IS

13   SUPPOSEDLY NOVEL ABOUT THIS INVENTION.  IT'S SOMETHING THAT

14   ELIMINATES ALL THESE USER ACTIONS THAT YOU HAVE TO ENTER IN

15   ORDER TO GET AN EMAIL ADDRESS.  SOMETHING THAT HAPPENS

16   AUTOMATICALLY WITHOUT ANY KIND OF USER INPUT.

17            NOW, WE'LL SEE HOW THAT TAKES PLACE IN SPAMEX.

18            (PAUSE IN PROCEEDINGS.)

19            MR. YANNEY:  SO, HERE WE'RE LOOKING AT EXHIBIT 5

20   AGAIN.  AND THIS IS THE SCREEN THAT YOU GET WHEN SPAMEX IS

21   FIRST LAUNCHED WHILE YOU'RE LOGGED IN.  AND YOU'LL SEE KIND OF

22   TOWARDS THE MIDDLE OF THE PAGE THERE.  THE USER STILL HAS TO

23   CLICK ON THE "CREATE ADDRESS BUTTON" IN ORDER TO CREATE AN

24   ADDRESS.  SO, THIS IS THE -- FIRST WE HAVE THE STEP OF

25   LAUNCHING THE PRODUCT.  THAT'S CLEARLY GOING TO HAPPEN IN ANY

1    KIND OF SCENARIO.

2            HERE'S THE ADDITIONAL STEP THAT DOESN'T MAKE IT

3    AUTOMATIC IS THAT THE USER FIRST HAS TO EXPLICITLY PUSH THIS

4    BUTTON,"CREATE ADDRESS."  IT DOESN'T GET SENT TO YOU

5    AUTOMATICALLY.  THERE IS NO AUTOMATIC ASSOCIATION.

6            THE SECOND STEP:  AFTER THE USER INDICATES THAT THEY

7    WANT TO CREATE AN ADDRESS, SOME INFORMATION GETS POPULATED IN

8    THE SCREEN.  AND THE USER THEN HAS TO DO A SECOND ACTION, WHICH

9    IS TO PRESS THE "SUBMIT BUTTON."  SO, ONCE THE SUBMIT BUTTON IS

10   PRESSED, THEN, WE SEE ON EXHIBIT 10 THAT THE DISPOSABLE EMAIL

11   ADDRESS HAS NOW BEEN GENERATED.  AND THAT'S THE ADDRESS WE SEE

12   KIND OF TOWARDS THE TOP OF THE POP-UP SCREEN WHERE IT SAYS,

13    "ADDRESS:  AND IT'S A VG9- -- I THINK THAT'S

14   O-T7AU@SPAMEX.COM."  SO, WE HAD TWO DISTINCT USER ACTIONS THAT

15   HAD TO BE TAKEN BEFORE ANY DISPOSABLE EMAIL ADDRESS IS EITHER

16   GENERATED OR ASSOCIATED WITH ANYTHING.

17           NOW, THERE WAS SOME MENTION OF THE PATENTEE'S

18   COMMERCIAL PRODUCT, SOMETHING CALLED "EMAILIAS," WHICH WAS

19   DISCUSSED AT LENGTH IN THE VARIOUS SUBMISSIONS.  TWO POINTS I'D

20   LIKE TO MAKE.  FIRST OFF IS NONE OF THAT INFORMATION SHOULD BE

21   CONSIDERED IN DETERMINING INFRINGEMENT BECAUSE INFRINGEMENT --

22   YOU KNOW, AT LEAST ALL THE CASES THAT I'VE READ ALWAYS SAY THE

23   SAME THING.  IT'S A TWO-STEP PROCESS.  THE FIRST STEP IS

24   CONSTRUING THE CLAIMS.  AND THE COURT HAS DONE THAT.  THE

25   SECOND STEP IS TO TAKE THE CLAIMS AS CONSTRUED AND COMPARE THEM

1    TO THE ACCUSED PRODUCT.

2              THE COURT:  WELL, THAT IS QUITE SO.

3              MR. YANNEY:  YES.  SO, I AM AT A BIT OF A LOSS AS TO

4    WHY WE SHOULD EVEN CONSIDER INFORMATION ABOUT A PATENTEE'S

5    COMMERCIAL PRODUCT WHICH MAY OR MAY NOT PRACTICE THE PATENT IN

6    DETERMINING WHETHER OR NOT THIS ACCUSED PRODUCT INFRINGES.  SO,

7    THAT'S THE FIRST POINT I'D LIKE TO MAKE THAT IT SHOULD BE

8    DISREGARDED.

9              THE SECOND POINT I'D LIKE TO MAKE IN CONNECTION WITH

10   THAT INFORMATION IS THE VARIOUS INFORMATION THAT WE HAVE BEEN

11   PRESENTED WITH IN CONNECTION WITH THIS SUPPOSED COMMERCIAL

12   IMPLEMENTATION HAS ACTUALLY BEEN INCONSISTENT.  I HAVE SEEN AT

13   LEAST THREE SEPARATE DECLARATIONS THAT HAVE BEEN SUBMITTED BY

14   THE INVENTOR PAUL MACINTOSH WHICH SEEM TO CONTRADICT EACH

15   OTHER.  SO, I CAN'T REALLY TELL --

16             THE COURT:  IN WHAT WAY?

17             MR. YANNEY:  SURE.  I'LL WALK THROUGH THAT.

18             THE COURT:  WELL, YOU KNOW, DON'T UNTIL WE HAVE TO.

19             MR. YANNEY:  OKAY.

20             THE COURT:  BECAUSE YOUR FIRST STATEMENT IS RIGHT.

21             MR. YANNEY:  YES.

22             WELL, I'LL JUST DESCRIBE IT GENERALLY.  THEY

23   CONTRADICT THEMSELVES IN THAT IN THE FIRST DECLARATION THE

24   DESCRIPTION OF THIS EMAILIAS SYSTEM SEEMED TO MATCH UP WITH

25   WHAT WAS IN THE PATENT.  IT WAS FULLY AUTOMATIC.  YOU PRESS A

1  BUTTON.  YOU GOT YOUR EMAIL ADDRESS.  IT WAS ALL DONE

2  AUTOMATICALLY.  THAT WAS IN THE JANUARY '09 DECLARATION.

3        FAST FORWARD TO THE APRIL '09 DECLARATION, NOW WE

4  HAVE A DIFFERENT DESCRIPTION OF THE EMAILIAS PRODUCT IN THE

5  SENSE THAT IT'S NO LONGER AUTOMATIC, BUT THE USER MUST CLICK A

6   "CONTINUE" BUTTON IN ORDER TO HAVE AN EMAIL ADDRESS

7  GENERATED.  SO, I'M NOT REALLY SURE WHICH OF THOSE DESCRIPTIONS

8  IS THE MORE CORRECT ONE.  BUT I THINK BASED ON THE FIRST POINT

9  I MADE, IT'S ALL, I THINK, IRRELEVANT IN TERMS OF THE

10  INFRINGEMENT ANALYSIS.

11        THE NEXT NON-INFRINGEMENT ARGUMENT THAT WE HAVE IS

12  THIS CONCEPT OF BEING "DEDICATED FOR USE" BY AN ENTITY.  AND AS

13  I SAID BEFORE, "DEDICATED FOR USE" HAS BEEN INTERPRETED BY THE

14  COURT AS MEANING "SOLELY AND EXCLUSIVELY FOR USE."

15        AND WHEN WE PUT THAT LANGUAGE INTO THE CLAIM, IT

16  READS,

17        "SOLELY AND EXCLUSIVELY FOR USE BY AN ENTITY

18        ASSOCIATED WITH SAID WEB PAGE."

19        SO, THERE IS A UNIQUE ONE-TO-ONE 100 PERCENT ALL OF

20  THE TIME CORRESPONDENCE.  THAT'S THE ONLY WAY YOU CAN HAVE

21  SOMETHING "DEDICATED FOR USE."  AND IN SPAMEX WE DON'T HAVE

22  ANYTHING THAT'S "DEDICATED FOR USE" IN THE SENSE THAT THE SAME

23  EMAIL ADDRESS CAN BE USED WITH MULTIPLE WEBSITES.

24        AND HERE AS WE LOOK AT EXHIBIT 12 WE HAVE THE EMAIL

25  ADDRESS, FOR EXAMPLE, THE FIRST ONE UCSB49@SPAMEX.COM.  AND

1   THAT ONE IS ACTUALLY ASSOCIATED WITH THREE DIFFERENT WEBSITES:

2   CNN, WSJ, WHICH IS THE WALL STREET JOURNAL, AND THE NEW YORK

3   TIMES, NYTIMES.

4          WE ALSO HAVE ANOTHER DISPOSABLE EMAIL ADDRESS:

5   UCLA57@SPAMEX.COM.  AND WE SEE THAT THAT ONE IS ACTUALLY

6   ASSOCIATED WITH THREE DIFFERENT WEBSITES -- GOOGLE, YAHOO, AND

7   NYTIMES.  SO, WE CLEARLY DON'T HAVE THIS CONCEPT OF "DEDICATED

8   FOR USE."  OUR DISPOSABLE EMAIL ADDRESS CAN BE USED WITH

9   MULTIPLE WEBSITES.

10         NOW, THE ARGUMENT HAS BEEN MADE THAT IF YOU HAVE AN

11  EMAIL ADDRESS THAT'S INITIALLY ASSOCIATED WITH JUST A SINGLE

12  WEBSITE, THEN, ISN'T THAT "DEDICATED FOR USE."

13         AND THE RESPONSE TO THAT IS NOT REALLY BECAUSE

14   "DEDICATED" MEANS THAT IT IS NOT CAPABLE OF BEING SHARED UNDER

15  ANY CIRCUMSTANCE WITH OTHER WEBSITES.  SO, EVEN THOUGH THERE

16  MAY INITIALLY BE A ONE-TO-ONE RELATIONSHIP, THAT IS REALLY NOT

17  DEDICATED FOR USE BECAUSE THAT'S AN EMAIL ADDRESS -- CAN AND

18  OFTENTIMES WILL BE AVAILABLE FOR USE WITH MULTIPLE WEBSITES.

19  IT'S KIND OF LIKE A MASTER/SERVANT RELATIONSHIP.  IF I'M A

20  MASTER, AND I HAVE A SERVANT THAT I BELIEVE IS DEDICATED FOR MY

21  USE, THEN, THE UNDERSTANDING IS THAT 100 PERCENT OF THE TIME

22  PAST, PRESENT, AND FUTURE THAT THAT SERVANT IS DEDICATED FOR MY

23  USE AND ONLY MY USE.  NOT THAT IF A SECOND MASTER COMES ALONG,

24  AND THAT SERVANT THEN STARTS TO WORK FOR THEM, YOU KNOW, THAT

25  IS NOT A SITUATION WHERE THERE WAS ANY KIND OF DEDICATION ON

 1    THE PART OF THE SERVANT DURING THEIR INITIAL SERVICE.

 2           SO, YOU KNOW, IN OUR SYSTEM THERE IS NO WAY OF

 3    PREVENTING A USE OF ONE EMAIL ADDRESS WITH MULTIPLE WEBSITES.

 4    SO, THAT NEGATES ANY KIND OF PURE DEDICATION FOR USE.

 5           AND IF WE LOOK AT EXHIBIT 14, THAT JUST KIND OF

 6    REINFORCES THE SAME POINT IN THE SENSE THAT THIS IS NOW LOOKING

 7    AT THE UCLA57@SPAMEX.COM EMAIL ADDRESS.  AND UNDER ITS

 8    PROPERTIES WE SEE UNDER SITE DOMAIN --

 9           MR. GREENE:  THE ONE BEHIND IT --

10           MR. YANNEY:  OH, SORRY.

11           UNDER SITE DOMAIN, WE SEE A GOOGLE, YAHOO, AND

12    NYTIMES ARE DIFFERENT WEBSITES THAT ARE ALL ASSOCIATED WITH

13    THAT ONE EMAIL ADDRESS.

14           (PAUSE IN PROCEEDINGS.)

15           MR. YANNEY:  GOING BACK TO THE WEB PAGE WEBSITE

16    POINT, ONE COMMENT I'D LIKE TO ADD IS THAT THE POINT HAS BEEN

17    MADE THAT YES A WEB PAGE IS DIFFERENT THAN A WEBSITE.  AND HOW

18    ABOUT THE CASE WHERE YOU HAVE A WEBSITE THAT'S ONLY MADE UP OF

19    ONE WEB PAGE.  ISN'T THAT THE SAME AS HAVING AN ASSOCIATION

20    WITH A WEB PAGE.  AND THE ANSWER TO THAT IS NO BECAUSE IF WE GO

21    BACK AND LOOK AT THOSE SLIDES, I THINK EXHIBIT 6 WILL SERVE THE

22    POINT -- AT THE TOP YOU SEE WHAT INFORMATION IS NEEDED IN ORDER

23    TO IDENTIFY A WEB PAGE.  IN THE POP-UP WINDOW YOU SEE WHAT

24    INFORMATION IS NEEDED TO IDENTIFY A WEBSITE.  THEY'RE CLEARLY

25    DIFFERENT.  AND BY IDENTIFYING A WEBSITE, THAT DOES NOT

1  NECESSARILY MEAN THAT YOU HAVE BY DEFINITION ALSO IDENTIFIED A

2  WEB PAGE.

3          SO, WE HAVE ALL ON BOTH SIDES OF THIS ISSUE DISCUSSED

4  THE BOOK-AND-PAGE ANALOGY THAT, YOU KNOW, WHAT WE DO IS AKIN TO

5  ASSOCIATING WITH A BOOK NOT NECESSARILY THE INDIVIDUAL PAGES OF

6  A BOOK.  AND THEN THE RESPONSE TO THAT IS WELL WHAT ABOUT A

7  BOOK WITH ONE PAGE IN IT.  AGAIN, THE SAME ARGUMENT.  BY

8  ASSOCIATING WITH A BOOK, WE PROVIDE THE INFORMATION THAT

9  IDENTIFIES THE BOOK.  IT COULD BE THE TITLE.  IT COULD BE THE

10  COVER.  IT COULD BE WHAT'S ON THE SPINE.  IT'S THOSE PIECES OF

11  INFORMATION THAT ARE ASSOCIATED WITH THE BOOK -- NOT

12  NECESSARILY THE INFORMATION THAT'S ASSOCIATED WITH EVEN A

13  SINGLE PAGE THAT COULD BE CONTAINED IN A BOOK.

14          THERE IS OTHER ANALOGIES ONE COULD USE.  FOR EXAMPLE,

15  A DECK OF CARDS AND THE BOX THAT HOLDS THE DECK OF CARDS.  YOU

16  KNOW, WE ASSOCIATE WITH THE DECK OF CARDS BY ASSOCIATING WITH,

17  YOU KNOW, THE BOX THAT THE CARDS GO INTO.  THAT IS NOT THE SAME

18  AS ASSOCIATING WITH EVERY SINGLE CARD INSIDE THE BOX.  AND EVEN

19  IF IT GETS DOWN TO THE POINT WHERE YOU'VE LOST 51 OF THE CARDS,

20  AND YOU ONLY HAVE ONE CARD LEFT, WE STILL PROVIDE ASSOCIATION

21  INFORMATION FOR THE BOX AND NOT THE INDIVIDUAL CARDS INSIDE THE

22  BOX.

23          ANOTHER ANALOGY IS, YOU KNOW, A TOWN VERSUS, YOU

24  KNOW, A HOUSE LOCATED IN A TOWN.

25          THE COURT:  I UNDERSTAND.

1          MR. YANNEY:  OKAY.

2          ONE LAST POINT I'D LIKE TO MAKE, WHICH WON'T TAKE

3     HARDLY ANYTHING, IS THAT I HAVE POINTED OUT THE

4     NON-INFRINGEMENT ARGUMENTS IN CONNECTION WITH THE INDEPENDENT

5     CLAIMS.  AND THAT BY DEFINITION ANY DEPENDENT CLAIM WHICH IS

6     DEPENDENT ON THOSE INDEPENDENT CLAIMS IS GOING TO BE SIMILARLY

7     NOT INFRINGED FOR AT LEAST THE SAME REASONS AS THE UNDERLYING

8     --

9          THE COURT:  I UNDERSTAND THAT TOO.

10         MR. YANNEY:  -- BASICALLY.

11         THAT'S ALL I HAVE TO SAY.  I HOPE I'VE KEPT IT

12    SOMEWHAT BRIEF AND EFFICIENT.

13         THE COURT:  PLEASE.

14         MS. KEAST:  GOOD MORNING, YOUR HONOR.  SHANNON KEAST

15    ON BEHALF OF WEBZERO.

16         PUTTING ASIDE SOME OF THE DETAIL OF MR. YANNEY'S

17    ARGUMENT, THE FUNDAMENTAL HERE IS THEY DIDN'T PRESENT ANY

18    EVIDENCE IN RESPONSE TO OUR FULLY SUPPORTED MOTION --

19    CROSS-MOTION FOR SUMMARY JUDGMENT.  AND FOR THAT REASON ALONE,

20    I THINK OUR MOTION IS DEMONSTRABLY SUCCESSFUL UNDER RULE 56.

21         BUT TO GO THROUGH IT IN MORE DETAIL, AND TO START

22    WITH HIS LAST POINT, WHICH WAS THE BOOK, DECK OF CARDS,

23    WHATEVER YOU WILL ANALOGY, IS IT'S UNDISPUTED THAT THEY BOTH --

24    BOTH THE INVENTION AND THE '41 PATENT AND SPAMEX LOOK AT THE

25    WEB PAGE IN ORDER TO DO WHAT THEY'RE GOING TO DO.

1          AS DETAILED IN THE MACINTOSH DECLARATION, SPAMEX DOES

2    IT BY LOOKING AT THE DOCUMENT.DOMAIN FIELD.  AND THE PATENT

3    DOES IT BY LOOKING AT THE DOCUMENT.ULR FIELD.  THEY BOTH LOOK

4    AT DOCUMENT, WHICH IS THE WEB PAGE.  AND THAT'S UNDISPUTED.

5    THAT'S SOMETHING THAT THEY -- CLICVU DISPUTED IN ITS RESPONSE

6    TO OUR CROSS-MOTION BUT DIDN'T PRESENT ANY EVIDENCE OF THAT.

7          SO, THEY START -- IN THE BOOK ANALOGY, HE WOULD LIKE

8    TO SAY THAT THEY START WITH THE BOOK.  BUT THEY DON'T.  THEY

9    START BY LOOKING AT THE PAGE AND THEN SAY, OH, WHAT BOOK IS

10   THIS FROM.  AND THEN THEY GET THE BOOK.  AND THAT'S WHY IT'S

11   ASSOCIATED WITH A WEB PAGE.

12         AND JUST FOR THE RECORD -- I THINK THE COURT IS

13   AWARE, BUT WE'VE NEVER SAID THAT "WEBSITE" AND "WEB PAGE" WERE

14   NOT DIFFERENT.  WE'VE ALWAYS MAINTAINED THAT THEY ARE AND

15   AGREED WITH THAT.

16         AND AS MR. MACINTOSH SET FORTH IN HIS DECLARATION, IT

17   WOULD BE -- A WEBSITE IS NECESSARILY COMPOSED OF WEB PAGES.  IT

18   WOULD BE -- LET ME SEE WHAT HIS ACTUAL WORD WAS -- SAID,

19             "A WEBSITE CANNOT EXIST WITHOUT COMPONENT PARTS,

20             E.G. WEB PAGES.  TO THE CONTRARY, IT WOULD BE

21             INACCURATE TO CALL A DOMAIN HAVING NO WEB PAGES A

22             WEBSITE."

23         SO, I THINK IT -- IT'S CLEARLY SET FORTH IN THE

24   EVIDENCE THAT'S ADMISSIBLE THAT WE PRESENTED THAT CLICVU DOES

25   ASSOCIATE AN EMAIL ADDRESS WITH A WEB PAGE.

1        AND THAT'S -- JUST FOR THE COURT'S REFERENCE, THAT'S

2   PARAGRAPH 23 OF THE MACINTOSH DECLARATION.

3        AND IN TERMS OF "AUTOMATICALLY ASSOCIATING WITH," I

4   THINK THAT --

5        THE COURT:  I'M SORRY?

6        MR. ORMOND:  IN TERMS OF "AUTOMATICALLY ASSOCIATING"

7   THE EMAIL ADDRESS WITH THE WEB PAGE, CLICVU HAS NEVER RESPONDED

8   TO THE POINT THAT WE MADE IN OUR PAPERS AND THE POINT THAT YOUR

9   HONOR MADE IN THE CLAIM CONSTRUCTION BRIEF, WHICH WAS SET FORTH

10  IN FOOTNOTE 4, WHICH IS THAT THE INVENTION CONTEMPLATES SOME

11  FORM OF USER INTERACTION.  AND IN CLAIM 2 IT SAYS THE WHOLE

12  PROCESS IS DONE IN RESPONSE TO A REQUEST BY THE USER.

13       AND, YES, THERE ARE THINGS THAT HAPPEN ON THE

14  BACK-END IN THE COMPUTER PROGRAM INHERENTLY.  BUT OUR POINT AS

15  WE SET FORTH IN OUR REPLY IS THAT WHEN A USER DOES THIS

16  PROCESS, THEY DON'T HAVE TO DO ANYTHING.  THE SYSTEM GOES OUT

17  AND FIGURES OUT -- IT FIGURES OUT THE WEB PAGE BY LOOKING AT

18  DOCUMENT.DOMAIN.  IT FIGURES OUT THE DOMAIN.  AND IT ASSIGNS AN

19  EMAIL ADDRESS.  IT DOES ALL OF THAT WITHOUT THE USER DOING

20  ANYTHING EXCEPT CLICKING A BUTTON, WHICH IS EXACTLY WHAT THE

21  PATENT CONTEMPLATES.

22       AND IN TERMS OF THE INCONSISTENCY THAT MR. YANNEY

23  REFERRED TO, I JUST DIRECT THE COURT TO PAGE -- PARAGRAPH 27 OF

24  THE MACINTOSH DECLARATION WHERE HE EXPLAINS THAT THERE'S TWO

25  DIFFERENT WAYS YOU CAN SET UP THE SYSTEM -- ONE IS TO BYPASS

1   THOSE SCREENS.  SO, YOU CAN JUST AUTOMATICALLY GO THROUGH

2   WITHOUT HAVING TO DO ANY EXTRA CLICKING.  AND THE OTHER IS

3   ANOTHER METHOD OF IMPLEMENTING IT THAT THE USER CAN CHOOSE

4   "OTHER OPTION."

5          SO, IT'S -- OUR POINT IS THAT EVERYTHING IS DONE BY

6   THE SYSTEM AUTOMATICALLY.  IT GRABS THE -- IT GRABS THE WEB

7   PAGE ADDRESS.  IT GENERATES THE EMAIL ALIAS AND BRINGS THEM

8   TOGETHER WITHOUT ANY ADDITIONAL INPUT FROM THE USER, WHICH IS

9   PRECISELY THE COURT'S CONSTRUCTION TERM -- OF THE TERM.

10          AND IN TERMS OF "DEDICATED FOR USE," CLICVU DOESN'T

11   DISPUTE THAT IN ITS DEFAULT FORM SPAMEX DOES DEDICATE AN EMAIL

12   ADDRESS FOR USE BY AN ENTITY.  IT DOESN'T SAY THAT EMAIL

13   ADDRESSES ARE REQUIRED TO BE ASSOCIATED WITH OTHERS.  IT JUST

14   SAYS THEY CAN BE, WHICH INCIDENTALLY IS A FUNCTION IN THE '41

15   PATENT ANYWAY.

16          THE COURT:  I'M SORRY.  MAKE THE POINT AGAIN.

17          MS. KEAST:  THE "DEDICATED FOR USE POINT"?

18          THE COURT:  YES.

19          MS. KEAST:  IN ITS DEFAULT FORM, IF YOU ARE A NEW

20   USER TO SPAMEX, AND YOU USE THE PRODUCT, IT'S GOING TO

21   ASSOCIATE THE EMAIL FORWARDING ADDRESS OR THE EMAIL ALIAS --

22   THEY CALL IT -- TO THE WEB PAGE.

23          THE COURT:  YES.

24          MS. KEAST:  AND THAT DOMAIN EXCLUSIVELY UNLESS AND

25   UNTIL THE USER PULLS IT IN AND ASSOCIATES IT WITH SOME OTHER

1    DOMAIN, WHICH, ONE, IS A FUNCTIONALITY IN THE '41 PATENT, WE

2    SUBMIT TO CLAIM 18, WHICH DOES NOT CONTAIN THE "DEDICATED FOR

3    USE" LANGUAGE.  BUT, ALSO, IT'S STILL THAT POINT.  IT'S A

4    SINGLE ENTITY THAT IT'S ASSOCIATING IT WITH.  JUST BECAUSE A

5    USER CAN IF IT WANTS TO DECIDE TO HAVE AN EMAIL ALIAS

6    ASSOCIATED WITH OTHER WEBSITES, IT DOESN'T MEAN THAT THE

7    PRODUCT ISN'T INFRINGING IN ITS INHERENT FORM.

8         THE COURT:  I SEE.

9         MS. KEAST:  AND EVEN IF -- EVEN IF IT'S NOT LITERALLY

10   INFRINGING, WE SUBMIT THAT IT'S INFRINGING UNDER THE DOCTRINE

11   OF EQUIVALENTS BECAUSE IT'S AN INSUBSTANTIAL CHANGE.

12        AND THEN GOING ON A COUPLE OF THE SPECIFIC CLAIMS,

13   WITH RESPECT TO CLAIM 11, YOU KNOW, I THINK THAT THAT CLAIM

14   SPECIFICALLY DEMONSTRATES THAT THE '41 CONTEMPLATES THE USER

15   SENDING THE REQUEST IN THE INTRODUCTORY LANGUAGE OF THAT

16   PARAGRAPH.

17        AND THEN SPECIFICALLY AS I MENTIONED JUST A MOMENT

18   AGO WITH RESPECT TO CLAIM 18, YOU KNOW, IT DOESN'T CONTAIN THE

19   SAME "DEDICATED FOR USE" LANGUAGE.  SO, AT A MINIMUM SPAMEX

20   INFRINGES CLAIM 18 EVEN IF THE COURT DISAGREES WITH OUR

21   POSITION ON "DEDICATED FOR USE."

22        AND LET'S SEE --

23        (PAUSE IN PROCEEDINGS.)

24        MS. KEAST:  UNLESS YOUR HONOR HAS ANY QUESTIONS, I

25   BELIEVE THAT'S ALL I HAVE.

```
 1              THE COURT:  THANK YOU.

 2              PLEASE.

 3              (PAUSE IN PROCEEDINGS.)

 4              THE COURT:  OH, WAIT, MR. YANNEY.

 5         CAN YOU COMMENT -- WILL YOU COME BACK AND COMMENT ON

 6   WHAT HE SAID ABOUT EMAILIAS.

 7              MS. KEAST:  OH, CERTAINLY.

 8         WE DON'T -- WE DON'T DISAGREE AT ALL WITH THE

 9   STANDARDS.  IT'S ABSOLUTELY -- IT'S FUNDAMENTAL.  I THINK WE

10   SAID IT IN A FOOTNOTE OF OUR REPLY BRIEF THAT, YOU KNOW, THE

11   CLAIM TERM -- THE CLAIM IS PROPERLY CONSTRUED AGAINST THE

12   INVENTION.  WE INCLUDED THAT ONLY FOR COLOR FOR PERSPECTIVE OF

13   WHAT THE INVENTION IS.

14              THE COURT:  ALL RIGHT.  THAT'S --

15              MS. KEAST:  JUST BECAUSE IT'S DIFFICULT --

16              THE COURT:  -- FINE.

17              MS. KEAST:  -- TO IMAGINE THESE THINGS.

18              THE COURT:  YOU'VE MADE THE RECORD ON THAT.

19              GO ON.

20              MR. YANNEY:  WELL, I STILL DISAGREE THAT IT'S

21   PROBATIVE OF WHAT THE INVENTION IS WITHOUT, YOU KNOW, THE

22   PROPER FOUNDATION AND THE PROPER TESTIMONY TO ESTABLISH THAT.

23              I'D JUST LIKE TO RESPOND VERY QUICKLY TO A FEW OF THE

24   POINTS THAT WERE MADE.  THE FIRST ONE WAS THAT WHILE IT DOESN'T

25   MAKE A DIFFERENCE WHAT CLICVU DOES IN THE END BECAUSE IN THE
```

1    PROCESS THEY'RE, YOU KNOW, LOOKING AT THE WEB PAGE.  AND WHILE

2    THAT MAY OR MAY NOT BE TRUE, THAT'S NOT WHAT THE PATENT CLAIM

3    IS ABOUT.  IF YOU LOOK AT CLAIM 1, IT TALKS ABOUT ASSOCIATING

4    WITH THE WEB PAGE.  AND I'LL JUST PUT UP THE TEXT HERE.

5            (PAUSE IN PROCEEDINGS.)

6            MR. YANNEY:  THE CLAIM DOESN'T TALK ABOUT WHAT MAY

7    HAVE HAPPENED BEFORE THAT ASSOCIATION -- WHAT YOU MAY HAVE

8    LOOKED AT, WHAT YOU MAY HAVE CONSIDERED.  THE CLAIM TALKS ABOUT

9    AT THE END WHAT IS THE ASSOCIATION THAT'S MADE.  AND IT'S THE

10   ASSOCIATION BETWEEN THE EMAIL ADDRESS AND THE WEB PAGE.

11           AND THEN IF WE LOOK AT THE BODY OF THE PATENT ITSELF,

12   IF YOU LOOK AT COLUMN 10, ABOUT LINE 43 --

13           (PAUSE IN PROCEEDINGS.)

14           MR. YANNEY:  THIS COLUMN IS DESCRIBING WHAT'S GOING

15   ON IN TERMS OF THE EMAIL ADDRESS GENERATION.  AND IT STARTS OUT

16   BY SAYING THAT THE USER ACTIVATES THE EMAIL FORWARDING ADDRESS

17   REQUEST.  DROPPING DOWN TO LINE 19, THE WEB BROWSER THEN SENDS

18   A REQUEST.  AND THEN DOWN TO LINE 24, THE WEB SERVER IN

19   RESPONSE TO THAT REQUEST SENDS A REQUEST TO THE DATA SERVER.

20   THEN DROPPING DOWN TO LINE 34, THE DATABASE SERVER CREATES THE

21   EMAIL ADDRESS AND ASSIGNS PROPERTIES TO THE EMAIL FORWARDING

22   ADDRESS.

23           MR. ORMOND:  WHERE ARE YOU --

24           MS. KEAST:  WHAT COLUMN ARE YOU ON?

25           THE COURT:  I'M SORRY.  I DON'T KNOW EITHER.

```
1              MR. YANNEY:  COLUMN 10.

2              MR. GREENE:  THE FIRST -- THE COLUMNS AREN'T SHOWING

3    ON THE SCREEN.

4              MR. YANNEY:  OH.  LET ME GO BACK --

5              MR. GREENE:  OF THE FIRST --

6              MR. YANNEY:  OKAY.

7              MS. KEAST:  I DON'T THINK IT FITS, BUT I HAVE IT

8    NOW.

9              MR. YANNEY:  YES.  I'M TRYING TO MAKE IT READABLE.

10             MS. KEAST:  THANK YOU.

11             MR. YANNEY:  SURE.

12             SO, THIS IS JUST WALKING THROUGH THE STEPS THAT ARE

13   INVOLVED IN THE PROCESS.

14             THE FIRST ONE IS THE USER ACTIVATES THE EMAIL ADDRESS

15   REQUEST.

16             THE SECOND STEP, LINE 19, THE WEB BROWSER THEN SENDS

17   THAT REQUEST TO THE WEB SERVER.  GOING ON TO LINE 24, THE WEB

18   SERVER IN RESPONSE TO THAT REQUEST SENDS A REQUEST TO THE

19   DATABASE SERVER.

20             THEN WE DROP DOWN TO LINE 34, THE DATABASE SERVER

21   CREATES THE NEW EMAIL ADDRESS THAT IS AUTOMATICALLY ASSOCIATED

22   WITH THE WEB PAGE ADDRESS.  AND HERE'S THE IMPORTANT PART.  IT

23   THEN ASSIGNS PROPERTIES TO THE EMAIL FORWARDING ADDRESS.  AND

24   THIS IS WHAT GETS STORED AS PART OF THE ASSOCIATION.

25             ONE OF THOSE PROPERTIES -- IF YOU DROP DOWN TO LINE
```

1    43, WHICH YOU CAN BARELY SEE.  I WILL PUT IT UP HERE AGAIN.

2              ONE OF THOSE PROPERTIES THAT GETS STORED IS THE WEB

3    PAGE ADDRESS THAT CAUSED THE USER TO MAKE THE EMAIL ADDRESS

4    REQUEST.  SO, THAT IS THE ASSOCIATION.  IT IS THE ASSOCIATION

5    BETWEEN THE WEB PAGE AND THE EMAIL ADDRESS THAT'S CREATED

6    THAT'S STORED IN THE DATABASE.  IT'S NOT STORING ANY OF THOSE

7    STEPS ALONG THE WAY -- WHAT IT MAY HAVE LOOKED AT, WHAT IT MAY

8    HAVE CONSIDERED.  SO, THE FACT THAT SPAMEX MAY OR MAY NOT LOOK

9    AT OR CONSIDER, YOU KNOW, WEB PAGE INFORMATION, THAT DOESN'T

10   ANSWER THE QUESTION OF AT THE END OF THE DAY THE CLAIM REQUIRES

11   THAT YOU ASSOCIATE THE EMAIL ADDRESS WITH THE WEB PAGE.  AND

12   YOU DO THAT BY STORING THAT INFORMATION.  SO, WE DON'T DO

13   THAT.

14             THE SECOND POINT THAT WAS MADE WAS THAT CLAIM 2

15   REFERS TO USER REQUEST.  AND I'M SOMEWHAT PUZZLED BY THE

16   RELEVANCE OF LOOKING AT A CLAIM OTHER THAN CLAIM 1, FOR

17   EXAMPLE, TO INTERPRET CLAIM 1.  I THINK IT SHOULD BE FAIRLY

18   STRAIGHTFORWARD THAT CLAIM 1 SHOULD BE CAPABLE OF BEING

19   INTERPRETED JUST BY LOOKING AT CLAIM 1.  THE SAME APPLIES TO

20   ALL THE OTHER INDEPENDENT CLAIMS.  SO, I AM STILL WONDERING

21   WHAT THE RELEVANCE IS OF CLAIM 2.

22             THE NEXT POINT THAT WAS MADE HAD TO DO WITH

23    "DEDICATION FOR USE."  AND HERE IT MIGHT BE HELPFUL TO KIND OF

24   TOUCH ON THE DIFFERENCE BETWEEN DEDICATING SOMETHING FOR USE

25   AND ASSOCIATING IT.

1              THE CLAIM REQUIRES THAT YOU DEDICATE THAT EMAIL

2    ADDRESS FOR A SINGLE ENTITY -- 100 PERCENT ALL OF THE TIME.  WE

3    DON'T DO THAT.  WE MIGHT ASSOCIATE THE EMAIL ADDRESS WITH AN

4    ENTITY IF THAT'S THE ONLY ENTITY THAT IT'S ASSOCIATED WITH.

5    BUT THE DOOR IS ALWAYS OPEN FOR ASSOCIATIONS WITH OTHER

6    ENTITIES AS WE SAW IN THE PREVIOUS EXAMPLES.  DEDICATION FOR

7    USE MEANS THAT THE DOOR IS ALWAYS CLOSED.  AND THAT'S A

8    PRINCIPLE --

9              THE COURT:  WHO CLOSES THE DOOR?

10             MR. YANNEY:  I DON'T KNOW BECAUSE IN OUR SYSTEM WE

11   DON'T CLOSE THE DOOR.  I ASSUME IN THE SOFTWARE THAT YOU

12   PROGRAM IT SO THAT ONCE YOU HAVE CREATED AN EMAIL ADDRESS --

13   IT'S KIND OF A MONOGAMOUS RELATIONSHIP -- JUST ONE FOR ONE.

14   AND THAT'S IT.  NO THIRD PARTIES INVOLVED.

15             NOW, THE LAST POINT THAT WAS MADE WHILE EVEN IF THERE

16   IS NO LITERAL INFRINGEMENT, THERE IS INFRINGEMENT UNDER THE

17   DOCTRINE OF EQUIVALENTS.  AND THAT ARGUMENT LEAVES ME A LITTLE

18   BIT EMPTY IN THE SENSE THAT I THINK YOU NEED A LITTLE BIT MORE

19   THAN JUST A CONCLUSION OF, WELL, THERE'S INFRINGEMENT UNDER THE

20   DOCTRINE OF EQUIVALENTS BECAUSE THERE IS A SUBSTANTIAL

21   DIFFERENCE.

22             AND THE CASE LAW IS PRETTY CLEAR THAT YOU CANNOT

23   ESTABLISH INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS JUST

24   BY CONCLUSORY STATEMENTS LIKE THAT.  YOU HAVE TO WALK THROUGH

25   WHAT THE CLAIM IS ABOUT.  YOU HAVE TO SHOW WHY THERE IS A

1    SUBSTANTIAL DIFFERENCE.  THE MOST POPULAR WAY OF DOING THAT IS

2    BY THE WELL-KNOWN FUNCTION-WAY-RESULT APPROACH WHERE YOU HAVE

3    TO METHODICALLY ADDRESS FOR EACH CLAIM ELEMENT THAT YOU'RE

4    ASSERTING IS MET BY EQUIVALENTS, WHAT'S THE FUNCTION, WHAT'S

5    THE WAY, AND WHAT'S THE RESULT OF THAT CLAIM ELEMENT AND THEN

6    SHOW HOW THE FUNCTION, WAY, AND RESULT ARE ACHIEVED IN THE

7    ACCUSED PRODUCT.  I HAVEN'T SEEN ANY MENTION OF THAT ANYWHERE

8    IN THIS CASE.  THAT'S ALL I HAVE, YOUR HONOR.

9         THE COURT:  ANYTHING FURTHER?

10        MS. KEAST:  YES.  PLEASE.  VERY BRIEFLY.

11        COUNSEL KEEPS RETURNING TO A POINT THAT YOU'VE

12   ALREADY ACTUALLY ADDRESSED IN THE CLAIM CONSTRUCTION BRIEF,

13   WHICH IS, THE IDEA OF THERE BEING A ONE-TO-ONE RATIO BETWEEN A

14   WEB PAGE AND AN EMAIL ADDRESS.

15        AND YOU REJECTED THAT POINT AS YOU WELL KNOW -- AND

16   FOR GOOD REASON BECAUSE THAT'S JUST NOT WHAT THE CLAIM TERMS

17   MEAN.  IT WOULD READ -- THE CLAIM TERM -- IT WOULD READ THE

18   TERM "DEDICATED FOR USE" OUT OF CLAIMS 1, 11, AND 30 BECAUSE

19   IT'S ABSENT FROM 18.

20        AND IN TERMS OF REFERRING TO CLAIM 2, THIS IS ABOUT

21   THE USER HAVING TO MAKE A REQUEST TO SET THE PROCESS GOING.  I

22   THINK THE COURT'S ALREADY ACKNOWLEDGED THAT A USER MAKES

23   REQUESTS.  BUT IT'S ALSO IN COLUMN 10 OF LINE 14, WHICH COUNSEL

24   JUST HAD UP IN FRONT OF THE COURT.

25        AND THE FUNDAMENTAL WITH THE "DEDICATED FOR USE"

1    POINT IS THE OPTION TO USE A PRODUCT IN A NON-INFRINGING MANNER

2    DOES NOT MEAN THAT IT DOESN'T INFRINGE.  IT STILL INFRINGES AT

3    IT -- IN ITS CORE FUNDAMENTAL WAY THAT IT OPERATES.

4            AND MY FINAL POINT IS THAT IN TERMS OF THE DOCTRINE

5    OF EQUIVALENTS, AS WE EXPLAINED IN OUR REPLY, I DON'T SEE WHY

6    WE WOULD HAVE TO SET FORTH EVERY SINGLE ARGUMENT WE MADE IN OUR

7    LIMITATIONS SECTION AGAIN JUST WITH THE IDEA THAT THEY ARE NOW

8    -- IF YOU DON'T FIND IT TO BE A LITERAL INFRINGEMENT, THEN,

9    IT'S UNDER THE EQUIVALENTS.  I MEAN, IT'S THE SAME -- VERY

10   SIMILAR POINTS, VERY SIMILAR OPERATION.  AS WE EXPLAINED, THE

11   TWO LIMITATIONS ARE, ONE, THAT IT CAN BE IF THE USER WANTS IT

12   TO BE ASSOCIATED WITH OTHER WEBSITES, WHICH AS I MENTIONED IS A

13   FUNCTIONALITY THAT THE PATENT HAS.

14           AND THE OTHER ONE WAS THAT IT -- LET'S SEE WHAT WAS

15   IT -- THE OTHER CONTEMPLATED DIFFERENCE THAT AT LEAST I COULD

16   IDENTIFY WAS THAT THE EXTRA CLICK OF THE BUTTON, WHICH I JUST

17   THINK IS AN INSUBSTANTIAL DIFFERENCE, IF ANY AT ALL.

18           I HAVE NOTHING FURTHER.  IF YOU HAVE ANY QUESTIONS.

19           THE COURT:  THE ARGUMENT IS THAT THE EXTRA CLICK OF

20   THE BUTTON IS INCONSEQUENTIAL.

21           MS. KEAST:  IF IT'S -- I THINK IT LITERALLY INFRINGES

22   DESPITE THE EXTRA CLICK OF THE BUTTON.  BUT IF IT DOESN'T, I

23   THINK IT'S INCONSEQUENTIAL.  YES.

24           THE COURT:  ALL RIGHT.

25           MS. KEAST:  THANK YOU.

```
 1              THE COURT:  ANYTHING FURTHER?

 2              MR. YANNEY:  I THINK WE'VE REACHED THE POINT OF

 3    DIMINISHING RETURNS WITH ADDITIONAL COMMENTS.

 4              THE COURT:  YES.  I THINK YOU'RE RIGHT.

 5              SO, IT IS UNDER SUBMISSION.  AND WE WILL RULE PRETTY

 6    QUICKLY.

 7              AND THANK YOU VERY MUCH FOR COMING.

 8              MR. ORMOND:  THANK YOU, YOUR HONOR.

 9              THE COURT:  IT'S A LONG WAY, BUT --

10              MR. YANNEY:  I THINK IT WAS WORTH IT.

11              THE COURT:  GOOD.  I'M SURE THE COURT DOES TOO.

12              MR. ORMOND:  YOUR HONOR, I THINK WE WERE SUPPOSED TO

13    FINALIZE THE SCHEDULING ORDER TODAY AS WELL.

14              THE COURT:  YES.

15              MR. ORMOND:  IS THAT CORRECT?

16              THE COURT:  YES.

17              MR. ORMOND:  I'M SORRY.  I DIDN'T MEAN TO INTERRUPT.

18              THE COURT:  YES.

19              THANK YOU.

20              (PROCEEDINGS ADJOURNED AT 10:55 A.M.)

21

22

23

24

25
```

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4
 5      I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
 6  TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
 7  MATTER.
 8
 9                                 DATE:
10
11
12
                         MARGARET JEAN BABYKIN, CSR NO. 10466
13
14
15
16
17
18
19
20
21
22
23
24
25
```